AMCO Insurance Company v. Lauren Spencer, Inc. et al.                                                    Doc. 24

Case 2:06-cv-00472-GLF-NMK    Document 24    Filed 06/20/2007    Page 1 of 26

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**AMCO INSURANCE COMPANY,**

       **Plaintiff,**

                           **Case No. 2:06-cv-472**
                           **JUDGE GREGORY L. FROST**
    **v.**                      **Magistrate Judge Norah McCann King**

**LAUREN-SPENCER, INC., et al.,**

       **Defendants.**

### OPINION AND ORDER

This matter is before the Court for consideration of the following sets of filings:

(1) a motion for partial summary judgment (Doc. # 20) filed by Defendants Lauren-Spencer, Inc., Shirley Lee, Bowen Lee, and Popphie Lee and a memorandum in opposition (Doc. # 23) filed by Plaintiff, AMCO Insurance Company; and

(2) a motion for summary judgment (Doc. # 21) filed by Plaintiff, AMCO Insurance Company, and a memorandum in opposition (Doc. # 22) filed by Defendants Lauren-Spencer, Inc., Shirley Lee, Bowen Lee, and Popphie Lee.

For the reasons that follow, the Court **GRANTS** the Lauren-Spencer Defendants' motion for partial summary judgment (Doc. # 20) and **DENIES** AMCO's motion for summary judgment (Doc. # 21).

1

Dockets.Justia.com

# I. Background

The parties have jointly submitted the following agreed-upon facts:[1]

1. Plaintiff AMCO Insurance Company ("AMCO") is an Iowa insurance company that has its home office in Des Moines, Iowa, and that is authorized to do business in Ohio.

2. Defendant George G. Harris a/k/a George G. Harris' Wildlife Collection ("Harris") is a New Jersey resident. Harris is engaged in the sculpting, design manufacture, marketing and sale of ornamental jewelry designs that are sold throughout the United States.

3. Defendant Lauren-Spencer, Inc. ("Lauren-Spencer") is an Ohio corporation with its principal place of business in Powell, Ohio. Lauren-Spencer was formerly operated under the name OTC, Inc.

4. Defendant Shirley Lee is an individual residing in Ohio. Shirley Lee is an employee of Lauren-Spencer and has been employed by Lauren-Spencer since at least 2002.

5. Defendant Bowen Lee is an individual residing in Ohio. Bowen Lee is an employee of Lauren-Spencer and has been employed by Lauren-Spencer since at least 2002.

6. Defendant Popphie Lee is an individual residing in Ohio. Popphie Lee is an employee of Lauren-Spencer and has been employed by Lauren-Spencer since at least 2002. Popphie Lee, Bowen Lee, Shirley Lee, and Lauren-Spencer are referred to collectively herein as "the Lauren-Spencer Defendants."

7. Lauren-Spencer is in the costume jewelry business. Lauren-Spencer does not manufacture any goods. Rather, Lauren-Spencer purchases costume jewelry from manufacturers in Asia, imports the goods to the United States, and resells the goods to customers.

---

[1] For ease of reading, the Court has omitted all sentences in the stipulated facts that simply direct the Court to submitted exhibits (e.g., "A true and correct copy of the Policy is attached hereto as Exhibit A.").

8.  At all times pertinent to this litigation, Lauren-Spencer did not own or operate a retail store.  Instead, Lauren-Spencer offered its products for sale in three main ways: i) booths at trade shows, ii) brochures intended to elicit telephone and Internet orders, and iii) a web-site.  Lauren-Spencer did sell some custom jewelry, including the dog breed jewelry at issue in this case, to customers directly from its home office in Powell, Ohio.

9.  On or about October 21, 2003, Lauren-Spencer purchased from AMCO Policy No. ACP WHDO 7101414105 (the "Policy"), which provided general liability coverage for the period from October 21, 2003 to October 21, 2004. . . .

10.  On or about September 14, 2004, George Harris filed a lawsuit against OTC, Inc., Lauren-Spencer, Inc., Shirley Lee, Bowen Lee, Daniel Lee, and Popphie Lee in the United States District Court for the Souther District of Ohio, Eastern Division with case number 2:04 CV 884 ("the <u>Harris</u> lawsuit"). . . .

11.  The complaint in the <u>Harris</u> lawsuit alleges that Harris holds a copyright interest in various ornamental jewelry designs, including works depicting various dog breeds. . . .

12.  The complaint in the Harris lawsuit further alleges that the Lauren-Spencer Defendants "infringed said copyrights by marketing, advertising, and placing upon the market various molded and cast ornamental pieces which were, upon information and belief, copied directly from Plaintiff's copyrighted works." . . .

13.  Lauren-Spencer sold the dog breed jewelry that Harris contends infringes on what he claims are his copyrights no earlier than February, 2004 and no later than October 5, 2004.

14.  Lauren-Spencer sold the dog breed jewelry that Harris contends infringes on what he claims are his copyrights at trade shows.  The dog breed jewelry pieces that Harris contends infringes on what he claims are his copyrights were mounted to display boards for potential customers to view at the trade shows.

15. In 2004, Lauren-Spencer ordered, received, and distributed brochures offering Lauren-Spencer products for sale, including the dog breed jewelry that Harris alleges infringes on what he claims are his copyrights.

16. The brochures were packaged with goods that were shipped to Lauren-Spencer customers. Lauren-Spencer also displayed the brochures at trade shows.

17. Throughout 2004, a website was maintained by or for Lauren-Spencer. The website offered for sale all of the costume jewelry products depicted in the brochure. The website was arranged to correspond with the different pages in the brochure. The website contained digital photographs of each piece of costume jewelry. At times in 2004, the website contained pages that depicted the dog breed jewelry (digitally photographed) that Harris contends infringes on what he claims are his copyrights. The website also contained pricing information and a "shopping cart" page by which customers could purchase products, including the dog breed jewelry.

18. In October 2004, the Lauren-Spencer Defendants tendered the Harris lawsuit to AMCO, seeking both a defense and also indemnification, should the Harris lawsuit result in a damages award against them.

19. By letter dated November 12, 2004, AMCO agreed to provide the Lauren-Spencer Defendants with a defense to the Harris lawsuit and assigned the law firm of Hammond and Sewards to defend the Lauren-Spencer Defendants with respect to the same.

20. By letter dated November 23, 2004, AMCO reasserted its intention to provide a defense for the Lauren-Spencer Defendants. AMCO, however, further indicated that it was "investigating this matter and defending under a reservation of rights."

(Doc. # 19, at 1-3.)

On June 14, 2006, AMCO initiated the instant litigation. In a single-count complaint, the

company seeks a declaratory judgment that because the policies issued to the Lauren-Spencer

Defendants do not cover or exclude coverage for each claim asserted by Harris in the other

lawsuit, AMCO has no duty to defend or to indemnify the Lauren-Spencer Defendants or Daniel Lee.[2]  (Doc. # 1 ¶¶ 41-48.)  The Lauren-Spencer Defendants in turn filed three counterclaims. The first counterclaim seeks a declaration of coverage and therefore a defense and indemnification in the *Harris* lawsuit.  (Doc. # 10 ¶¶ 20-25.)  The second counterclaim asserts breach of contract (Doc. # 10 ¶¶ 26-31), and the third counterclaim is a bad faith claim (Doc. # 10 ¶¶ 32-36).

The parties agreed to resolve the principal coverage issue by cross-motions for summary judgment and to defer proceeding on the remaining causes of action pending the coverage decision.  (Doc. # 14.)  Those motions are now ripe for disposition.

## II.  Discussion

### A.  Standard Involved

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *See Muncie Power Products, Inc. v. United Tech. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

---

[2]  Effective November 22, 2006, the dismissed Daniel Lee is no longer a party to this litigation.  *See* Doc. # 14, at 2.

In viewing the evidence, the Court must draw all reasonable inferences in favor of the nonmoving party, who must set forth specific facts showing that there is a genuine issue of material fact for trial. *Id.* (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234 (6th Cir. 2003). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Muncie*, 328 F.3d at 873 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Consequently, the central issue is " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Hamad*, 328 F.3d at 234-35 (quoting *Anderson*, 477 U.S. at 251-52).

### B. Analysis

The overarching coverage issue in this case involves two inquiries: examination of a potential duty to defend and examination of a potential duty to indemnify. Because this is a diversity case, Ohio law directs the Court's analysis of these distinct duties. The Ohio Supreme Court has explained the state law involved in duty-to-defend cases:

> The duty of defense is much broader than the duty of indemnification and can be invoked even though no liability is ultimately established. * * * In *Motorists Mut. Ins. Co. v. Trainor* (1973), 33 Ohio St.2d 41, 62 O.O.2d 402, 294 N.E.2d 874, this court held that under a liability insurance policy, it is the scope of the allegations against the insured that determines whether an insurance company has a duty to defend the insured. * * * "[W]here the complaint brings the action within the coverage of the policy the insurer is required to make defense, regardless of the ultimate outcome of the action or its liability to the insured." * * * The *Motorists* holding was expanded in *Willoughby Hills v. Cincinnati Ins. Co.* (1984), 9 Ohio St.3d 177, 179, 9 OBR 463, 459 N.E.2d 555, in which we stated that "the duty to defend need not arise solely from the

6

allegations in the complaint but may arise at a point subsequent to the filing of the complaint."

*Pilkington N. Am., Inc. v. Travelers Cas. & Sur. Co.*, 112 Ohio St.3d 482, 488, 861 N.E.2d 121,

127 (2006).  The state's highest appellate court has also explained that

> where the insurer's duty to defend is not apparent from the pleadings in the case against the insured, but the allegations do state a claim which is potentially or arguably within the policy coverage, or there is some doubt as to whether a theory of recovery within the policy coverage had been pleaded, the insurer must accept the defense of the claim.

*Willoughby Hills*, 9 Ohio St.3d at 180, 459 N.E.2d at 558.  Ohio courts of appeals, such as the

Tenth District Court of Appeals, have similarly explained:

> An insurer's duty to defend is broader than and distinct from its duty to indemnify.  *Socony-Vacuum Oil Co. v. Continental Cas. Co.* (1945), 144 Ohio St. 382, 29 O.O. 563, 59 N.E .2d 199, paragraph one of the syllabus; *W. Lyman Case & Co. v. Natl. City Corp.* (1996), 76 Ohio St.3d 345, 347, 667 N.E.2d 978.  An insurer has an absolute duty to defend an action when the complaint contains an allegation in any one of its claims that could arguably be covered by the insurance policy.  *Sanderson v. Ohio Edison Co.* (1994), 69 Ohio St.3d 582, 635 N.E.2d 19, at paragraph one of the syllabus.  Once an insurer must defend one claim within a complaint, it must defend the insured on all the other claims within the complaint, even if they bear no relation to the policy coverage.  *Preferred Mut. Ins. Co. v. Thompson* (1986), 23 Ohio St.3d 78, 80, 23 OBR 208, 491 N.E.2d 688.
>
> On the other hand, an insurer need not defend any action or any claims within the complaint when all the claims are clearly and indisputably outside of the contracted policy coverage.  *Preferred Risk Ins. Co. v. Gill* (1987), 30 Ohio St.3d 108, 113, 30 OBR 424, 507 N.E.2d 1118.  The duty to defend an action is not determined by the action's ultimate outcome or the insurer's ultimate liability.  *Motorists Mut. Ins. Co. v. Trainor* (1973), 33 Ohio St.2d 41, 62 O.O.2d 402, 294 N.E.2d 874, at paragraph two of the syllabus.  There is no duty to defend "if there is no set of facts alleged in the underlying complaint against the insured that, if proven true, would invoke coverage."  *Cincinnati Indemn. Co. v. Martin* (1999), 85 Ohio St.3d 604, 605, 710 N.E.2d 677.

*Cardiothoracic & Vascular Surgical Specialists, Inc. v. Travelers Indem. Co.*, No. 05AP-1355, 2006 WL 3805675, at *5 (Ohio App. 10 Dist. Dec. 28, 2006).

The more narrow duty to indemnify is tied to an insured's actual legal liability. *Cooper Tire & Rubber Co. v. Travelers Cas. & Sur. Co.*, No. 5-06-40, 2007 WL 1175183, at *4 (Ohio App. 3d Dist. Apr. 23, 2007). In contrast to a duty to defend, which looks to the allegations of a complaint (and, potentially, subsequent allegations), a duty to indemnify "arises from the conclusive facts and resulting judgment" of the underlying litigation. *Pilkington*, 112 Ohio St.3d at 487, 861 N.E.2d at 127. Thus, if coverage exists here, then AMCO has a duty to defend and, should Harris prevail in his lawsuit, to indemnify the Lauren-Spencer Defendants.

Application of the foregoing law here naturally begins with the general liability policy involved in this case. The policy, AMCO Policy No. ACP WHDO 7101414105, provides in relevant part:

**COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY**

**1.    Insuring Agreement**

    a.    We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. . . .

8

(Doc. # 19, Ex. A, Policy, at 0013-014.)  The policy then sets forth various damages limits before a section titled "Exclusions," which provides in part:

> This insurance does not apply to:
>
> **a.      Knowing Violation Of Rights Of Another**
>
> "Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the acts would violate the rights of another and would inflict "personal and advertising injury";
>
> **b.      Material Published With Knowledge Of Falsity**
>
> "Personal and advertising injury" arising out or oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity;
>
> . . .
>
> **i.      Infringement Of Copyright, Patent, Trademark or Trade Secret**
>
> "Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights.
>
> However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.
>
> . . .
>
> **l.      Unauthorized Use Of Another's Name Or Product**
>
> "Personal and advertising injury" arising out of the unauthorized use of another's name or product in your email address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

(Doc. # 19, Ex. A, Policy, at 0014-015.)

Section V of the policy sets forth various definitions pertinent to the issues before the

Court, including:

1.    "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters.  For the purposes of this definition:

    a.    Notices that are published include material placed on the Internet or on similar electronic means of communication; and

    b.    Regarding web-sites, only that part of a web-site that is about your goods, products or services for the purpose of attracting customers or supporters is considered an advertisement.

(Doc. # 19, Ex. A, Policy, at 0021.)  Section V also provides:

14.    "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

    a.    False arrest, detention or imprisonment;

    b.    Malicious prosecution;

    c.    The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed bu or on behalf of its owner, landlord or lessor;

    d.    Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

e.    Oral or written publication, in any manner, of material that violates a person's right of privacy;

f.    The use of another's advertising idea in your "advertisement"; or

g.    Infringing upon another's copyright, trade dress or slogan in your "advertisement".

(Doc. # 19, Ex. A, Policy, at 0023.)

AMCO argues that the foregoing policy provisions operate to preclude coverage because the Lauren-Spencer Defendants cannot show that Harris' purported injury arises out of covered infringement in an advertisement as the policy defines those terms. The insurance company initially reasons that although Harris' complaint pleads multiple theories of recovery, the thrust of that litigation is that the Lauren-Spencer Defendants infringed on Harris' copyrights by copying his jewelry and selling them as Lauren-Spencer designs. Thus, AMCO contends, there is no coverage because the policy applies only to infringement in an insured's advertisement and not to other copyright infringement. AMCO argues that the fact that the *Harris* Complaint includes the allegation that the Lauren-Spencer Defendants advertised the purportedly infringing jewelry does not trigger coverage because there must be infringement *in the advertisement*. In other words, AMCO asserts that the Lauren-Spencer advertisements do not meet the Section V, subsection 14(g) requirement that the injury arise out of "[i]nfringing upon another's copyright, trade dress or slogan in [the] 'advertisement.' " (Doc. # 19, Ex. A, Policy, at 0023.) The subsection (i) exclusion produced above tracks this construction, restoring coverage otherwise precluded by the exclusion.

The core issues in this initial argument are therefore (1) what claims the *Harris* case involve and (2) whether the Lauren-Spencer Defendants have used allegedly infringing material in an "advertisement" as the policy defines that term.

In regard to the first issue, the claims at issue in *Harris* encompass the Lauren-Spencer Defendants' use of photographs that contained depictions of infringing product in advertising. (Doc. # 19, Ex. B, Harris Compl. ¶¶ 30, 31.)  In an attempt to evade coverage, AMCO attempts to distinguish between advertising that contains copyrighted photographs and advertising that contains photographs of copyrighted designs.  But *Harris* targets both alleged copying of the products involved and the alleged advertising of copyrighted material.  As the Lauren-Spencer Defendants correctly point out, Harris' property rights are a bundle of rights and include the right to preclude others from advertising his images (even if misappropriated).

In regard to the second issue, the joint stipulations indicate that the Lauren-Spencer Defendants featured the allegedly infringing pins on display boards at trade shows, in brochure pictures, and in website pictures.  AMCO argues that such use does not constitute covered activity for a number of reasons, each of which the Court shall address in turn.

The insurance company contends that there is no infringement in advertisement because there is a difference between using (1) copyrighted photographs or photographs of the *actual* copyrighted products (both of which AMCO concedes would be covered) and (2) photographs of products that infringe another's copyright (which AMCO argues is not covered).  The Lauren-Spencer Defendants in turn properly direct this Court to a number of cases that sufficiently support their assertion that if their products copied Harris' goods, they photographed their

products, and then they displayed their products in advertising, they have violated Harris'

assumed copyright.  *Video Pipeline, Inc. v. Buena Vista Home Enter., Inc.*, 192 F. Supp. 2d 321,

334 (D.N.J. 2002); *Sony Computer Enter., Am. Inc. v. Gamesmasters*, 87 F. Supp. 2d 976, 989

(N.D. Cal. 1999).  This Court agrees with the reasoning of these cases and rejects AMCO's

creative, if unfounded, argument.

     AMCO also contends that the Lauren-Spencer Defendants' display boards, brochures,

and website do not constitute advertisements under the terms of the policy because they fail to

contain written or printed statements.  This argument imputes into the policy requirements that

are not there.  The policy language defines "advertisement" simply as "a notice that is broadcast

or published to the general public or specific market segments about your goods, products or

services for the purpose of attracting customers or supporters."  (Doc. # 19, Ex. A, Policy, at

0021.)  Nowhere in that definition are the specific requirements that AMCO seeks to impose, and

the insurance company's reliance on the term "notice" to backdoor the requirements into the

policy is of no avail.  Ohio law recognizes that advertising encompasses the use of visual

communication, which means that a visual image can announce a product's existence and, in a

sufficient context, its availability for sale.  *See Ohio Disc. Merch., Inc. v. Westfield Ins. Co.*, No.

2006CA00059, 2006 WL 2773245, *5 (Ohio App. 5th  Dist. Sept. 26, 2006) (holding that the

use of copyrighted photographs on product boxes arguably constitutes "advertisement" as

defined in an identically worded policy, which led to infringing upon another's copyright, trade

dress, or slogan).  This recognition undercuts AMCO's dubious characterization of the Lauren-

Spencer Defendants' advertising as a curiously altruistic "service" to its customers.  Illusory

semantic distinctions aside, the obvious point of the display boards, brochures, and website is to

move product to make money, and such advertising is placing a product before the consumers' eyes to accomplish just that purpose.

Equally unpersuasive is AMCO's argument that the Lauren-Spencer Defendants' trade show boards, brochure pictures, and website pictures also do not constitute advertisements under the terms of the policy because "the alleged injury is neither the brochure nor the website. The alleged injury is the infringing product–the dog pins." (Doc. # 21, at 11.) This argument construes the *Harris* Complaint far more narrowly than its plain text reads. The first cause of action in that pleading targets numerous activities: "marketing, advertising and placing on the market [the allegedly infringing products]." (Doc. # 19, Ex. B, Harris Compl. ¶ 30.) That claim is quite clear that it is alleging infringement for *each* activity, stating:

> The design, production, marketing, advertising, display and/or sale by Defendants of copies of Plaintiff's copyrighted Works constitute infringement of the Works, and through their marketing, advertising, and sales activities, have caused harm and injury to Plaintiff, and constitute violations of Plaintiff's exclusive rights as copyright owner, under section 106 of the Copyright Act, among others, and thus constitute copyright infringement.

(Doc. # 19, Ex. B, Harris Compl. ¶ 31.) Thus, contrary to AMCO's argument, Harris *is* alleging injury because of the advertising of the offending pins (using Harris' copyrighted work via knockoffs in the photographs) *as well as* injury related to the physical creation and sale of the offending pins themselves. Harris' pleading fairly encompasses a claim for misappropriation of his copyrighted property, which includes the right to create (or exclude) derivative works. The advertised images are not original to the Lauren-Spencer Defendants, despite the fact that they are responsible for the images; the Lauren-Spencer Defendants did not create the intellectual property shown via their handiwork. AMCO is therefore incorrect in asserting that "every

14

element" of the brochure and website was original to and created by the Lauren-Spencer Defendants.  (Doc. # 21, at 12.)  The insurance company's allegation may be true for most of the elements involved, but not for the infringing elements.

To support its arguments, AMCO contends that Sixth Circuit precedent mandates a denial of coverage in this case.  Citing *Advance Watch Co., Ltd. v. Kemper National Insurance Co.*, 99 F.3d 795 (1996), the insurance company asserts that as a matter of law there is no infringement in advertisement in this case.  The Sixth Circuit addressed in that case whether a pen manufacturer was entitled to a defense and indemnification in underlying trademark and trade dress infringement litigation.  The appellate court analyzed the liability policy involved in that case, which insured for "advertising injury."  *Id.* at 798.  The policy defined "advertising injury" in relevant part as the "[m]isappropriation of advertising ideas or style of doing business."  *Id.*  The policy did not define "misappropriation," however, and citing the absence of an explicit mention of trademark in the policy, the Sixth Circuit concluded that the policy "refer[red] to the unauthorized taking or use of interests other than those which are eligible for protection under statutory or common-law trademark law."  *Id.* at 802.  Notably, the *Advance Watch* court also explained:

> The district court's broad reading of "misappropriation of advertising ideas or style of doing business" to include a reference to trademark or trade dress infringement would therefore expand the sense of "advertising injury" to include nonverbal conduct–a result difficult to rationalize in light of the ordinary meaning of "advertising."

*Id.* at 803.  The Sixth Circuit held that this alone constituted grounds for denying coverage.  *Id.* at 806.

The appellate court also opined, however, that coverage did not exist for the distinct reason that there was no requisite causal nexus between any possible advertising activity and the claimed injury. Despite the fact that the complaint apparently targeted advertising in part, the Sixth Circuit reasoned that "it is the shape and appearance of the writing instruments themselves which [was] claimed to have caused injury." *Id.* at 807. Thus, the appellate court held that the insured's advertising activities did not cause the injury claimed to have been suffered by the claimant. *Id.*

Much of the rationale of *Advance Watch* has often been severely criticized by other courts and represents the minority view. *See Pizza Magia Int'l, LLC v. Assurance Co. of Am.*, 447 F. Supp. 2d 766, 772 (W.D. Ky. 2006) (summarizing criticism of *Advance Watch* and declining to apply its holding to Kentucky law). Notably, Michigan courts have wholly rejected the Sixth Circuit's *Advance Watch* construction of Michigan law:

> *Advance Watch* stands literally alone in a sea of case law which holds that the policy term "misappropriation of advertising ideas or style of doing business" encompasses claims of trademark and trade dress infringement. There is no need here to engage in any great dissertation on the law. Suffice it to say, the Court has reviewed these cases and in particular those decided since *Advance Watch* and agrees with defendant that the analysis and reasoning of the Sixth Circuit is not only unpersuasive and flawed, but demonstrates a lamentable lack of understanding and grasp of the law of trademark/trade dress, and ultimately lead to an unduly narrow holding and somewhat bizarre and tortured application of Michigan insurance law. The case has been roundly criticized and at present appears to be only cited as an example of what the law is clearly not. The Court in *Advance Watch* was required to resolve the issues before it based upon its understanding and belief as to how the Michigan Supreme Court would decide the matter, and while the decision may be considered persuasive authority, it is not binding. For reasons which will be quite apparent, this Court is convinced that no panel of the Michigan Court of Appeals or the Michigan Supreme Court would follow its lead and, accordingly, will also decline to do so.

*American States Ins. Co. v. Hayes Specialties, Inc.*, No. 97-020037 CK 4, 1998 WL 1740968, *3 (Mich. Cir. Ct. Mar. 6, 1998). *See also Home-Owners Ins. Co. v. Thomas Lowe Ventures, Inc.*, 1998 WL 1856221, *2 (Mich. Cir. Ct. Aug. 27, 1998).

In an attempt to distinguish *Advance Watch*, the Lauren-Spencer Defendants correctly point out that the case involved Michigan insurance law, not Ohio law, and involved trade dress, not copyright. The former portion of this argument inexplicably ignores, however, that the Sixth Circuit expressly applied *Advance Watch* to support holdings in a 1999 decision and in a 2002 decision that patent infringement did not constitute "advertising injury" under Ohio law.[3] *United Nat'l Ins. Co. v. SST Fitness Corp.*, 182 F.3d 447, 451 (6th Cir. 1999); *Weiss v. St. Paul Fire and Marine Ins. Co.*, 283 F.3d 790, 797-98 (6th Cir. 2002). The appellate court not only extended its rationale to Ohio law but from trade dress issues to patent infringement issues, which *arguably* implies that the Sixth Circuit might consider its *Advance Watch* rationale applicable to copyright issues as well.

Despite its 1999 and 2002 applications, the *Advance Watch* rationale is inapplicable to the instant litigation. This is because although the case is Sixth Circuit precedent, *Advance Watch* does not present current controlling Ohio law.

---

[3] As the Sixth Circuit noted in *SST Fitness*, at least one Ohio state court has agreed that patent infringement generally cannot constitute advertising injury. *See Synergystex Int'l, Inc. v. Motorists Mut. Ins. Co.*, No. 2290-M, 1994 WL 395626 (Ohio 9th App. Dist. July 27, 1994). The policy at issue in the instant case supports this conclusion, given that Exclusion (i) targets " '[p]ersonal and advertising injury' arising out of the infringement of . . . patent . . . rights." (Doc. # 19, Ex. A, Policy, at 0014.) *Synergystex* is of little value in the copyright case here, however, because Exclusion (i) expressly "does not apply to infringement, in [an] 'advertisement', of copyright, trade dress or slogan." (Doc. # 19, Ex. A, Policy, at 0014.)

Because this is a diversity case, the Court must apply state law. In looking for that law when the Ohio Supreme Court has not spoken on an issue, a federal court sitting in diversity must turn elsewhere to divine that state's law. The Sixth Circuit has identified the import of intermediate appellate state court decisions under such circumstances:

> In diversity cases, the federal courts must apply state law " 'in accordance with the then controlling decision of the highest state court.' " *United States v. Anderson County, Tennessee,* 761 F.2d 1169, 1173 (6th Cir.1985) (quoting *Vandenbark v. Owens-Illinois Glass Co.,* 311 U.S. 538, 543, 61 S.Ct. 347, 85 L.Ed. 327 (1941)); *see Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). If the forum state's highest court has not addressed the issue, the federal court must ascertain from all available data, including the decisional law of the state's lower courts, what the state's highest court would decide if faced with the issue. *See Bailey v. V & O Press Co.,* 770 F.2d 601, 604 (6th Cir.1985) (citing cases). "Where a state's highest court has not spoken on a precise issue, a federal court may not disregard a decision of the state appellate court on point, unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *Puckett v. Tennessee Eastman Co.,* 889 F.2d 1481, 1485 (6th Cir.1989); *accord Northland Ins. Co. v. Guardsman Products, Inc.,* 141 F.3d 612, 617 (6th Cir.1998). This rule applies regardless of whether the appellate court decision is published or unpublished. *See Talley v. State Farm Fire & Cas. Co.,* 223 F.3d 323, 328 (6th Cir.2000); *Puckett,* 889 F.2d at 1485.

*Ziegler v. IBP Hog Market*, 249 F.3d 509, 517 (6th Cir. 2001).

Guided by this directive, the Court turns to the intermediate appellate courts of Ohio. Such inquiry reveals that this is the exceedingly unusual case in which Sixth Circuit law cannot control, then, because Ohio explicitly rejected in 2006 what one Ohio court of appeals has described as *Advance Watch*'s "restrictive holding." *Westfield Ins. Co. v. Factfinder Mktg. Research, Inc.*, 168 Ohio App.3d 391, 401, 860 N.E.2d 145, 152 (Ohio App. 1st Dist. 2006) (trade dress case). Given this rejection, which this Court has no reason to disregard, the Court cannot say that Ohio law tracks the Sixth Circuit's pre-*Factfinder* construction and must instead credit the state court's analysis.

*Factfinder* rejected both of *Advance Watch*'s reasons for denying coverage.  The state court first explained "that trade-dress/trademark infringement necessarily involves advertising." *Id.* at 403, 860 N.E.2d at 153.  The appellate court then noted that in an "advertising injury" insurance coverage case, there indeed has to be a causal nexus between advertising activity and advertising injury.  *Id.*  But most importantly, *Factfinder* proceeded to explain that, in contrast to the more stringent *Advance Watch* rationale, Ohio law recognizes a looser causal connection in which the presentation of infringing material in advertising presents a " 'palming off' injury." *Id.*  In other words, according to Ohio law, the use of trade dress in *Factfinder* constituted an injury that satisfied the nexus between advertising activity and alleged advertising injury.[4]  The advertising does not just reveal an injury; it also contributes to it by helping to create consumer confusion (and in the present case by misappropriating in another form copyrighted material).

It is notable that courts in other jurisdictions have rejected the *Advance Watch* rationale in the copyright-advertising injury context.  *See, e.g., Ryland Group, Inc. v. Travelers Indem. Co. of Il.*, No. Civ. A-00-CA-233 JRN, 2000 WL 33544086, at *6 (W.D. Tex. Oct. 25, 2000) ("In contrast to *Advance Watch,* the Court finds that KFA's claim alleging that Ryland's advertising infringed its copyrights was provoked by the advertising itself."); *Home-Owners Ins. Co.*, 1998 WL 1856221, at *5 (" The claims of copyright infringement and misappropriation of advertising ideas or style of doing business was that TLV had infringed or misappropriated Mattel's copyright or trademarks or tradedress by the packaging of its products.  This ties directly to the course of advertising in that the court found that the packaging constitutes advertising.

---

[4]  Harris' second cause of action asserts a false designation of origin claim involving trade dress.  (Doc. # 19, Ex. B, Harris Compl. ¶¶ 35-50.)

Therefore, there is a direct causal nexus between the claimed 'advertising injury' and what the court found to be the 'course of advertising.' ").

Other Ohio case law similarly supports the Lauren-Spencer Defendants. *Factfinder* relied in part on dicta in the earlier case of *Westfield Cos. v. O.K.L. Can Line*, 155 Ohio App.3d 747, 804 N.E.2d 45 (Ohio App. 1st Dist. 2003). In *O.K.L.*, the state court of appeals addressed a trade-dress and patent infringement suit. The court concluded that "that trade-dress infringement necessarily involves advertising" and that the activity involved in that case satisfied the policy definition of advertising. *Id.* at 755, 804 N.E.2d at 51. Notably, the activity the court relied on in reaching this conclusion was that the infringing party's website "depict[ed] for sale the allegedly infringing product." *Id.* Also of import is that the state court held that "[a] web page is advertising under any definition." *Id.*

The same court of appeals later explained again that "the insurance contract [in *O.K.L.*] specifically defined 'advertisement' as 'a notice' that was intended to attract customers. [The court held that] [t]he marketing of the allegedly infringing products on a website satisfied this definition." *Factfinder*, 168 Ohio App.3d at 402, 860 N.E.2d at 153 (explaining *O.K.L.*).

This refutes the first rationale of *Advance Watch*. Section V of the policy involved here tracks this same definition of advertisement as "a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters." (Doc. # 19, Ex. A, Policy, at 0021.) Subsections (a) and (b) of the policy definition specifically contemplate website advertising.

The second *Advance Watch* rationale, the insufficiency of a causal nexus, fares no better for AMCO. The *O.K.L.* court addressed the precise proposition "that [the claimed] injuries

derived from the infringement, and not from the advertisement of the infringing product."  155

Ohio App.3d at 756, 804 N.E.2d at 51.  That state court acknowledged the holding of *Advance*

*Watch*, but expressly rejected it:

> Some courts have held in insurance disputes such as this one that the cause of an
> alleged trade-dress advertising injury is the initial copying of the trade dress, not
> the subsequent advertising that depicts the copied trade dress. [Cites *Advance*
> *Watch* in footnote.]  If we were to apply this rule, the advertising-injury coverage
> with respect to trade dress would be illusory-the insured would always be
> foreclosed from meeting the causation requirement. Surely this was not the intent
> of the parties. The language of the insurance contract required only that the "
> 'advertising injury' [be] caused by an offense arising out of your business * * *
> and that the 'advertising injury' aris[e] out of * * * infringing upon another's
> copyright, trade dress or slogan in your 'advertisement.' "

> Both the Second Circuit Court of Appeals and the Third Circuit Court of
> Appeals have interpreted the "arising out of" language as requiring the
> advertising to materially contribute to the injury of creating consumer confusion.
> But the advertisement does not need to be the only cause of the injury to trigger
> the duty to defend.  Ohio courts have interpreted the "arising out of" language
> more broadly.  The phrase has been defined to mean "flowing from," "having its
> origin in" or "growing out of." The phrase indicates a requirement of a causal
> relationship but not one of proximate cause. We apply the broad definition under
> Ohio insurance law, and, in doing so, we conclude that the requisite causal
> relationship was alleged in the complaint.

*Id.* at 756, 804 N.E.2d at 51-52.  The state court then proceeded to explain why various

exclusions did not operate to preclude coverage.[5]  The end result was a state court decision

---

[5]  One such exclusion was identical to AMCO's Exclusion (a) for the knowing violation
of the rights of another.  The Ohio court of appeals held the exclusion inapplicable because the
complaint involved stated a claim for intentional and, importantly, *non-intentional* infringement.
*O.K.L.*, 155 Ohio App.3d at 757, 804 N.E.2d at 52-53.  The *Harris* Complaint similarly asserts in
its first cause of action negligent infringement, in addition to intentional infringement.  (Doc. #
19, Ex. B. Harris Compl. ¶ 32.)  Similarly, the same rationale applies here that rendered
inapplicable the exclusion in *O.K.L.* that is identical to AMCO's Exclusion (b) for material
published with knowledge of falsity.  155 Ohio App.3d at 758, 804 N.E.2d at 53 ("[W]e hold
that this exclusion applied only to advertising injuries based upon libel, slander, disparagement,
and invasion of privacy.").

holding that Ohio law squarely rejects the very *Advance Watch* rationales upon which the Sixth

Circuit previously relied–and upon which AMCO now relies.

In reaching today's decision, this Court is also cognizant that the relevant portions of the

AMCO policy at issue in this litigation are virtually *identical* to policy provisions involved in the

post-*Advance Watch* case of *Ohio Discount Merchandise, Inc. v. Westfield Insurance Co.*, No.

2006CA00059, 2006 WL 2773245, *5 (Ohio App. 5th  Dist. Sept. 26, 2006).  As noted earlier in

this Opinion, part of that case involved copyrighted photographs that were used on product

packaging, specifically the packaging of bobblehead figures. Construing the policy language, the

state court of appeals in *Ohio Discount Merchandise* reasoned:

> Paragraph 22 of the [underlying related case's] complaint alleges
> appellants willfully, deliberately and wrongfully misrepresented facts "about
> copyright ownership and licensing issues relating to the design of the bobblehead
> boxes."  The policy at issue defines "Personal and advertising injury" to include
> "injury, including consequential 'bodily injury' arising out of the insured's
> "infringing upon another's copyright, trade dress or slogan" in the insured's
> advertisement.
>
> We find appellant's use of the copyrighted photographs on the bobblehead
> boxes arguably constitutes "advertisement", as defined in the policy, infringing
> upon "another's" copyright, trade dress o[r] slogan.  Accordingly, we conclude
> the policy requires appellee to defend the insureds, unless coverage does not
> apply under the exclusionary language contained in Subsection 2 of the policy.

*Id.* at *5.  The outcome in that case ultimately turned on the fact that the underlying litigation

over which there was a coverage dispute arose out of an alleged breach of contract between the

parties, which was not an implied contract to use another's advertising idea.  That factual

scenario meant that the policy exclusion for " 'personal and advertising injury' arising out [of] a

'breach of contract, except an implied contract to use another's advertising idea' " applied and

precluded coverage.  *Id.*  In the instant case, however, there is no such contract issue, which

means that the rationale of *Ohio Discount Merchandise* supports finding coverage here.  What is important for present purposes is that Ohio law otherwise recognized that coverage existed for copyright infringement in advertising.

This leaves for discussion the exclusions.  The preceding analysis addresses Exclusion (i) and its built-in exception, as well as Exclusions (a) and (b), which were referenced in the briefing but not discussed.  One policy exclusion remains.

That policy provision is at the heart of AMCO's curious reliance on Exclusion (l), which also fails to puncture coverage here.  Exclusion (l) on its face targets tactics used to mislead another's potential customers in a narrow way.  This might matter if the issue before the Court were the second cause of action for trade dress impropriety, but the issue before the Court is the copyright claim.  The Lauren-Spencer Defendants can steal Harris' work without trying to mislead customers as to the origin of the product; sometimes stealing a design is just stealing a design without trying to mislead as to identity.  Additionally, and importantly, Exclusion (l) targets misdirection tactics.  Using another's name or product in an email address or metatag is a means of obscuring identity and drawing consumer traffic.[6]  The catch-all provision of Exclusion

---

[6] The Sixth Circuit has offered the following definition for "metatag":

"A 'metatag' is a list of words hidden in a web site acting as an index or reference source identifying the content of the web site for search engines."  J. Thomas McCarthy, *Trademarks and Unfair Competition* § 25:69 (4th ed.).  Metatags have been "analogized to the subject index of a card catalog indicating the general subject of a book."  *Id.*

*PACCAR Inc. v. Telescan Techs., L.L.C.*,  319 F.3d 243, 248 n.2 (6th Cir. 2003), *overruled in part on different grounds*, *KP Permanent Make-up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111 (2004).  Thus, the qualified catch-all of Exclusion (l) would encompass the use of another's name or product in, for example, a title tag, which "is text that is used as the title of a web page in the listings of a crawler-based search engine."  *Playboy Enters., Inc. v. Terri Welles, Inc.*, 78

(1)–"or any other *similar* tactics to mislead"–qualifies the catch-all in a restrictive manner so that it encompasses only tactics such as a misleading email address, domain name, or metatag.  In other words, the catch-all is not so open as to sweep into its scope activities that would not mislead the public, such as the alleged theft of designs constituting copyright infringement.  The logical leap AMCO attempts to make in connecting the use of displayed photographs with misleading tactics of the sort excluded in the policy assumes too much while crediting the policy language too little.  Accordingly, assuming without deciding that AMCO has not forfeited

---

F. Supp. 2d 1066, 1092 (S.D. Cal. 1999), *reversed in part on grounds apart from definition*, 279 F.3d 796 (9th Cir. 2002).  The purpose of using improper metatags and title tags is to draw traffic by playing on confused identities.  This would traditionally work as a result of a web surfer's use of search terms, or keywords, on an Internet search engine to find a website containing a sought-after product:

> When a keyword is entered, the search engine processes it through a self-created index of web sites to generate a (sometimes long) list relating to the entered keyword.  Each search engine uses its own algorithm to arrange indexed materials in sequence, so the list of web sites that any particular set of keywords will bring up may differ depending on the search engine used.  Search engines look for keywords in places such as domain names, actual text on the web page, and metatags.  Metatags are HTML code intended to describe the contents of the web site.  There are different types of metatags, but those of principal concern to us are the "description" and "keyword" metatags.  The description metatags are intended to describe the web site; the keyword metatags, at least in theory, contain keywords relating to the contents of the web site.  The more often a term appears in the metatags and in the text of the web page, the more likely it is that the web page will be "hit" in a search for that keyword and the higher on the list of "hits" the web page will appear.

*Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1045 (9th Cir. 1999) (citations omitted).  To a degree, this system has changed over time because "search engine algorithms [now] incorporate corporate dollars into their formulae.  Firms can pay the search engines in return for primary placement among the search results."  *Interstellar Starship Servs., Ltd. v. Epix, Inc.*, 304 F.3d 936, 945 n.10 (9th Cir. 2002).

reliance on the exclusion by raising it apparently for the first time in its briefing, Exclusion (l) is nonetheless simply inapplicable here.

In light of the foregoing, the Court must conclude that covered advertising was involved here and that the advertising materially contributed at least in part to a related injury, constituted its own distinct injury, or even both. There is thus a duty to defend here under Ohio law[7] because the *Harris* Complaint contains an allegation in at least one of its claims that could arguably be covered by the insurance policy. *See Sanderson*, 69 Ohio St.3d 582, 635 N.E.2d 19, paragraph one of the syllabus. And because AMCO must defend one claim within the *Harris* Complaint, the insurance company must also defend the Lauren-Spencer Defendants on *all* the other claims in that complaint, even if they bear no relation to the policy coverage. *See Preferred Mut. Ins. Co.*, 23 Ohio St.3d at 80, 491 N.E.2d at 690. There is also a duty to indemnify, the ultimate realization of which depends on disposition of the underlying litigation pending before another judicial officer in this District.

### III. Conclusion

For the foregoing reasons, the Court **GRANTS** the Lauren-Spencer Defendants' motion for partial summary judgment (Doc. # 20) and **DENIES** AMCO's motion for summary judgment (Doc. # 21). In accordance with the November 20, 2006 Preliminary Pretrial Order, the Magistrate Judge shall therefore hold a continued preliminary pretrial conference to facilitate the resolution of the remainder of this action. (Doc. # 14, at 2.)

---

[7] As the Lauren-Spencer Defendants correctly note, other jurisdictions similarly recognize that claims such as those asserted by Harris are not as one-dimensional as AMCO contends and that copyright claims of the sort alleged here satisfy the causal nexus requirement. *See, e.g., W. Am. Ins. Co. v. Moonlight Design, Inc.*, 95 F. Supp. 2d 838 (N.D. Ill. 2000) (construing policy under New York law).

**IT IS SO ORDERED**.

        <ins>  /s/ Gregory L. Frost    </ins>
        GREGORY L. FROST
        UNITED STATES DISTRICT JUDGE